UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.  4:21-CR-668 AGF/PLC |
| | ) |
| JAMES MAYES, | ) |
| | ) |
| Defendant. | ) |

### Report and Recommendation

The Government charged Defendant with 34 counts, including one count of robbery on land acquired for the use of and under the concurrent jurisdiction of the United States in violation of 18 USC § 7(3) and § 2111, 11 counts of brandishing a firearm in furtherance of a crime of violence in violation of 18 USC §924(c)(1)(A), 12 counts of felon in possession of a firearm in violation of 18 USC 922(g)(1), and 10 counts of interfering with commerce by robbery threats or violence in violation of 18 USC §1951(a), for conduct occurring between October 13, 2021 and November 10, 2021 in the City of St. Louis and St. Louis County. [ECF No. 1] This matter is before the Court on Defendant's Motion to Suppress Statements [ECF No. 76].

Defendant seeks to suppress his statements to law enforcement following his arrest on the grounds that (1) he did not knowingly and voluntarily waive his *Miranda* rights, and (2) he was incapable of providing a knowing and voluntary waiver of his *Miranda* rights.  Specifically, Defendant contends he did not knowingly and voluntarily waive his *Miranda* rights because he has a "low IQ," a fourth-grade education, was under the influence of K2 and prescription medications for his mental health conditions at the time of the interrogation, and the law enforcement officers used coercive police tactics to obtain his confession.  [ECF No. 76]  The

Government opposes Defendant's motion asserting, Defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights. [ECF No. 86]

The Court held an evidentiary hearing on October 24, 2023, and the parties elected not to file post-hearing briefs. Based on the arguments of the parties and the evidence adduced at the hearing, the Court recommends denial of Defendant's motion.

## Findings of Fact[1]

On November 10, 2021, Defendant was arrested by St. Louis County police in connection with robbery of a Cricket Wireless on Lemay Ferry Road. (Tr. 5, 12, 15) The following morning, officers transported Defendant from the St. Louis County jail to a St. Louis County police station for an interview. (Tr. 16) Defendant was placed in an interview room at approximately 11:12 a.m. (Ex. 1) Shortly thereafter, an officer provided Defendant with two bags of chips and a soft drink. (Ex. 1) While waiting for the interview to begin, Defendant ate and drank some of the food before knocking on the interview room door and requesting a cigarette. (Ex. 1) At 11:51 a.m., Detective Nicholas Hayden, a detective with the St. Louis Metropolitan Police Department, and Paul Moritz, a police officer with the St. Louis County Police Department, entered the interview room. (Tr. 5-6, Ex. 1)

The officers gave Defendant a cigarette and asked Defendant about himself, attempting to build a rapport with Defendant. (Tr. 6, Ex. 1) Defendant stated he had been released from prison in March and was currently homeless. (Ex. 1) Defendant claimed he had "mental health problems[,]" Alzheimer's disease, and that he lost "blocks of time[.]" (Ex. 1) Det. Hayden testified

---

[1] The Government called one witness, Detective Nicholas Hayden of the St. Louis Metropolitan Police Department, and submitted three video exhibits at the evidentiary hearing. The exhibits included a video recording depicting the entire time Defendant was in the interview room and two excerpts from the full-length video. Defense counsel cross-examined Det. Hayden but did not call any witnesses or introduce any exhibits at the hearing.

Defendant appeared alert and "seemed to follow what was going on." (Tr. 6-7).

Det. Hayden observed Officer Moritz administer Defendant *Miranda* rights. (Tr. 8, Exs. 1 at 12:08, 1A) Officer Moritz advised Defendant that he the right to remain silent, anything he said could be used against him in court, he could speak to a lawyer before or during questioning, and if Defendant could not afford a lawyer, one would be provided. (Ex. 1, 1A)  Defendant repeatedly nodded his head and stated "mmm-hmm" while Officer Moritz read Defendant his *Miranda* rights from a waiver form. (Ex. 1 at 12:09)

Officer Moritz then placed the form on the table in front of Defendant and stated "[b]efore we ask you any questions you must understand what your rights are. So, if you want to read through them…" (Ex. 1 at 12:09 p.m.) Defendant interrupted, stating "I already know what my rights is man, do I got to sign that?"  Officer Moritz replied, "No, No, you don't. But you understand your rights? Yes?" Defendant responded by nodding his head and saying "mmm-hmm." (Ex. 1)  Officer Moritz asked Defendant, "You're okay talking to me?" to which Defendant responded by nodding his head and saying "mmm-hmm." (Ex. 1)

Det. Hayden testified he believed Defendant understood his *Miranda* rights and was waiving them based on Defendant's actions of nodding, saying "mmm-hmm" and stating that he "already knew" his rights. (Tr. 8-9). For the remainder of the interview, Defendant did not inquire about his *Miranda* rights. (Tr. 9, Ex. 1).

Officer Moritz then began inquiring about the Cricket Wireless robbery near where Defendant was arrested the previous day. (Ex. 1) Defendant responded that he did not know where Lemay Ferry was located. (Ex. 1) Defendant explained that he got on a bus near Gravois Road after inadvertently smoking K2 and did not know where he was when he got off the bus. (Ex. 1)

Defendant denied robbing the store and initially stated he did not remember going into the

3

store or speaking with the store's clerk because of the effects of the K2. (Ex. 1 at 12:35, 12:44-12:46 ) Defendant stated he was "trying to get his head together as he was coming down from [the K2]" when the police officer approached him. (Ex. 1 at 12:31)  In response to Officer Moritz's questions regarding some specific details of the robbery, Defendant told the officers that he had a fourth-grade education. (Ex. 1 at 12:55).

Defendant admitted he purchased a 9mm handgun for protection from someone in Lafayette Park and ammunition for the firearm from another individual. (Ex. 1, at 12:25-12:27) Defendant initially told the officers that he had to hold the gun and shoot with his right hand because he lacked the strength to fire with his left hand. (Ex. 1, at 12:28)

Detective Hayden then presented Defendant with photographs taken during other recent robberies in St. Louis City. (Ex. 1, Tr.  9)  Defendant stated "Damn, that's me" in response to one photograph and that the assailant "look[ed] like" him in response to another photograph. (Ex. 1, at 1:13) (Tr.  9).  Defendant, however, denied recognizing the suspect in other photographs and asserted he did not have clothes or shoes matching those worn by the suspect in the photographs. (Ex. 1) When the officers asked Defendant if ballistics would show that bullets fired during some of these robberies would match his gun, Defendant stated that he "sometimes…sells bullets." (Ex. 1, at 1:22)  Defendant then appeared to become upset, at which point the officers gave Defendant a cigarette and left the room. (Ex. 1)

The officers returned 13 minutes later, at which time Defendant asked to see the photographs again. (Ex. 1, at 1:40) The officers showed him the photographs and a video from one of the robberies. (Ex. 1) Det. Hayden continued to present reports and photographs from the robberies, noting that the suspect held a firearm in his left hand during the robberies.  (Ex. 1)

After several minutes, Defendant stated he was "putting some things together in my

4

head…now I know a lot of tricks…and dealing with this here kind of stuff…and the only thing that…the police are obviously concerned about….is trying to get someone convicted[.]" (Ex. 1, at 1:56p.m.) Defendant stated he needed some help and he did not "need no dying in prison." (Ex. 1 at 1:57 p.m.) Officer Moritz advised Defendant that the prosecutor made the "decision as far as certain things" but that honesty was the first step. (Ex. 1, at 1:57) Det. Hayden told Defendant the officers would "be the liaison between [Defendant] and the prosecutor" and would advise the prosecutor that Defendant "was honest with them." (Ex. 1, at 1:57 p.m.) Defendant asked for the officers' "word" that they would tell the prosecutor that Defendant was "honest" with them. (Ex. 1, at 1:58)

Defendant then admitted to committing multiple robberies in the City of St. Louis and St. Louis County, stating he "had to do something to help himself." (Tr. 9, Ex. 1)  Defendant told the officers he lied when he claimed he shot with his right hand and that he did not remember going into the Cricket Wireless and robbing the clerk. (Ex. 1, at 1:59-2:00) Defendant stated he robbed phone stores and gas stations because they were "easy." (Ex. 1, at 2:02)  Before committing a robbery, Defendant would find a spot nearby to leave his bookbag and cane. (Ex. 1, at 2:03) After the robbery, Defendant retrieved his belongings to change his clothes and walk with his cane. (Ex. 1, at 2:03) Defendant stated he changed clothes and used his cane so "they don't pay you no attention" and so that he would not match the description given to the police by the witnesses.  (Ex. 1, at 2:03-2:04) The officers ended the interview at approximately 2:30 p.m. (Ex. 1)

Det. Hayden testified he believed Defendant understood the officers' questions even though he "took a lot of time to think" about the questions. (Tr. 26-27)  Det. Hayden stated Defendant's drug use "did not seem to affect…his ability to answer questions" and Defendant appeared to understand what he was doing throughout the interview.  (Tr. 11) Det. Hayden

5

testified that Defendant was "responding appropriately to questions." (Tr. 11) Det. Hayden did not threaten or cause violence to Defendant prior to the recorded interview. (Tr. 11)

During cross-examination, Det. Hayden testified that, in the City of St. Louis, individuals with psychiatric issues are afforded the opportunity to see a nurse after being brought to jail but that he was "not sure" what the process was in St. Louis County. (Tr. 12) Det. Hayden state he "does not necessarily" inquire about a suspect's education level because a person can still be "smart based off the level of awareness of the street and day to day life" despite their lack of education. (Tr. 19) Det. Hayden testified Defendant was emotional or appeared confused "[t]o an extent" but that this was not abnormal. (Tr. 20) Det. Hayden says in those situations he will slow down, back up, or ask the question another way. (Tr. 20) When counsel inquired whether Defendant appeared to not understand the questions, Det. Hayden answered that be believed Defendant was being "deceptive" in his answers. (Tr. 22)

Det. Hayden testified that K2 impacts the brain and that he had experience with "numerous individuals" under the influence of K2. (Tr. 21) Det. Hayden stated Defendant did not appear under the influence of K2 during the interview and Defendant "exemplified none of which I had [] experienced or [been] exposed to of people being high on K2 before." (Tr. 21, 27)

## Discussion

Defendant seeks to suppress his November 11, 2021 statements to law enforcement,[2] asserting he did not knowingly and voluntarily waive his *Miranda* rights because he refused to sign the waiver form and did not verbally waive his rights. [ECF No. 76] Defendant further claims that he was incapable of knowingly and voluntarily waiving his rights because he had a "low IQ," a fourth-grade education, and was under the influence of K2 and prescription medications for his

---

[2] Defendant does not specifically identify the statements that he seeks to suppress.

6

mental health conditions.[3] Defendant contends that these conditions, combined with the officers' use of coercive police tactics, rendered his waiver involuntary. In support, Defendant argues a "psychiatric evaluation prepared in this case" establishes his education level and that his IQ is between 70 and 79, which is in the range for "borderline functioning." Defendant asserts in his motion, without citation to supporting evidence, that he was under the influence of K2 at the time of the interview and that he was prescribed medication for his bipolar and depression by the jail nurse prior to his post-arrest statement. The Government opposes Defendant's motion on the grounds Defendant expressly and implicitly waived his *Miranda* rights, and that such waiver was knowing and voluntary. [ECF No. 86]

Due process imposes on a federal court a duty to ascertain the voluntariness of a defendant's confession whether the confession arises out of "inherently coercive" police conduct or under circumstances suggesting "the confession is unlikely to have been the product of a free and rational will." Miller v. Fenton, 474 U.S. 104, 110 (1985) (citing Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944) for first quotation and Mincey v. Arizona, 437 U.S. 385, 401 (1978) for second quotation). There is no "talismanic definition of 'voluntariness,'" and a court must determine whether a statement was voluntary by looking at the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 224-25 (1973). See also United States v. Williams, 793 F.3d 957, 962 (8th Cir. 2015) ("To determine whether a statement is voluntary [the Court]

---

[3] In his motion, Defendant asserts that his prescription "medications prohibited him from knowingly and voluntarily waiving his rights under *Miranda* as well as providing a voluntary statement to law enforcement." [ECF No. 76] Although this statement suggests an attempt to assert claims of involuntariness based upon both *Miranda* and the Fifth Amendment, the remainder of Defendant's motion and memorandum relies exclusively on *Miranda* and does not present a separate due process analysis. [ECF No. 76] Accordingly, the Court focuses its analysis on the voluntariness of Defendant's statements under *Miranda*. The Court further notes that both issues are reviewed under the same standard. United State v. Makes Room, 49 F.3d 410, 414 (8th Cir. 1995).

7

examine[s] the totality of the circumstances…."). Furthermore, the Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'…." Colorado v. Connelly, 479 U.S. 157, 167 (1986). See also United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002); United States v. Robinson, 20 F.3d 320, 322 (8th Cir. 1994). In short, "[a] statement is involuntary when it [is] extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004). See also United States v. Vega, 676 F.3d 708, 718 (8th Cir. 2012).

It is also well-settled that a valid waiver of rights must be "knowing and intelligent." Miranda v. Arizona, 384 U.S. 436 (1966). To determine whether a defendant has validly waived his *Miranda* rights, a court engages in a two-step inquiry: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id.

If *Miranda* warnings are administered and a defendant makes a statement, the government must demonstrate that the statement is voluntary. United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999). Nevertheless, although "[t]he government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary," LeBrun 363 F.3d at 724, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare." Berkemer v. McCarthy, 468 U.S. 420, 423 n.20 (1984). In general, "[w]here the prosecution shows that a *Miranda* warning was given and that it was

8

understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis v. Thompkins, 560 U.S. 370, 384 (2010).

A. Waiver of *Miranda* Rights

Defendant argues he "never knowingly waived his *Miranda* rights" because Defendant "refuse[d] to sign the *Miranda* waiver form, [and] did not verbally waive his rights." [ECF No. 76 at 2] Defendant contends that "[t]he grunt [he] made to law enforcement does not qualify as a knowing and voluntary waiver." [ECF No. 76 at 2] The Government contends Defendant expressly told the officers that he understood his *Miranda* rights but did not want to sign the waiver form and that he further signaled his understanding by nodding and stating "mmm-hmmm" in response to Officer Moritz's recitation of his rights and inquiry into Defendant's understanding. [ECF No. 86]

Despite Defendant's refusal to the sign the waiver form, Defendant clearly waived his *Miranda* rights. Defendant repeatedly nodded his head, and stated "mmm-hmmm" while Officer Moritz read Defendant his rights. When Officer Moritz told Defendant that he must understand his rights prior to questioning, Defendant explicitly stated that he "already [knew]" his rights." When Officer Moritz asked Defendant again whether he understood his rights and whether Defendant was "okay" to talk to him, Defendant responded by nodding his head and saying "mmm-hmmm." Defendant did not further inquire about his rights during the interview and spoke with the officers at length. Although Defendant might have been more explicit verbally, his later statements and conduct were entirely consistent with a waiver of his Miranda rights.

In addition. Defendant's apparent contention that an individual must provide either a written waiver or expressly state that he or she is waiving their rights in order for a waiver to be effective is not consistent with settled law. Courts do not require a defendant's written or express

9

verbal acknowledgement of waiver of rights as a prerequisite to a finding that subsequent statements to law enforcement were obtained voluntarily. See, e.g., North Carolina v. Butler, 441 U.S. 369, 373 (1979) (waiver of *Miranda* rights is a question of substance rather than form, so while "[a]n express written or oral statement of waiver" "is usually strong proof of the validity of that waiver…[it] is not inevitably either necessary or sufficient to establish waiver."); U.S. v. Zamarripa, 544 F.2d 978, 981 (8th Cir. 1976) ("A voluntary waiver need not assume any particular form; it may be made in writing on a printed format or it may be made orally by replying to questions as in this case."); United States v. Adams, 820 F.3d 317, 320, 323 (8th Cir. 2016) (finding the defendant impliedly waived his *Miranda* rights even though defendant refused to sign an advice of rights form provided by law enforcement); United States v. House, 939 F.2d 659, 662 (8th Cir. 1991) (concluding "the defendant's refusal to sign a waiver form was not the equivalent of a statement indicating that he did not wish to answer questions" and waiver may be inferred when defendant responded to questions after being informed of his rights); Martin v. United States, 691 F.2d 1235, 1240 (8th Cir. 1982) (the defendant's waiver of his rights were inferred from the circumstances when defendant answered law enforcement's questions after stating that he understood his rights but refused to sign the waiver of rights form); Thai v. Mapes, 412 F.3d 970, 977 (8th Cir. 2005) (noting "[t]he Supreme Court has never held that an accurate oral warning may not suffice to inform a suspect of his constitutional rights). Here, Defendant's verbal acknowledgements of understanding as well as subsequent statements clearly support a finding of voluntariness under the circumstances reflected in the record before the Court.

    B.  Knowing and Voluntary Waiver

Defendant contends he could not provide a knowing and voluntary waiver of his *Miranda* rights because he has a low IQ, a fourth-grade education, and was under the influence of K2 and

10

prescription medication for his bipolar and depression when he gave his statement. [ECF No. 76] Defendant further contends that these conditions, combined with the officers' coercive tactics, rendered him unable "to waive his rights in any meaningful sense[.]" [ECF No. 76]

1. Under the Influence of K2 and Prescription Medication

In his motion, Defendant asserts that during police questioning he was "high from K2" "which he told law enforcement impaired his ability to participate in an interrogation[.]" [ECF No 76 at 3]. Defendant further asserts he was "prescribed medication by the jail nurse" "shortly after arriving at the St. Louis County Jail" and that "these medications prohibited him from knowingly and voluntarily waiving his rights under *Miranda*[.]" [ECF No. 76 at 4]

Defendant has failed to present evidence supporting any of these factual allegations. While the video recording establishes that Defendant advised officers that he had been high on K2 the previous day, nothing establishes that he continued to suffer effects from the drugs at the time of the interview approximately 24 hours later. Instead, Det. Hayden's uncontradicted testimony was that Defendant responded appropriately to the questions, that he did not appear under the influence of K2, and that Defendant's drug use did not seem to affect his ability to answer questions. (Tr. 11, 21, 27) Furthermore, Defendant failed to present evidence establishing that he was prescribed medication by a nurse working for the St. Louis County jail prior to his post-arrest statements, much less any evidence that he took those medications or that those medications adversely affected his ability to provide a knowing and voluntary waiver of his rights. Accordingly, because there is no evidence supporting Defendant's allegations that he was under the influence of K2 or prescription medications at the time of the interview or that even if he had ingested these substances they affected his ability to understand and respond to questioning, the Court denies Defendant's claim that the influence of these substances prevented him from knowingly and

11

voluntarily waiving his *Miranda* rights.

### 2. Low IQ and Limited Education

Defendant also argues he was unable to knowingly and voluntarily waive his *Miranda* rights because he has a "low IQ" and limited education. Specifically, Defendant asserts in his memorandum in support that his "IQ is between 70 and 79 which is borderline functioning" and that he has a fourth-grade education. [ECF No 76]

In his motion to suppress, Defendant references a "psychiatric evaluation prepared in this case" as support for his factual allegations regarding his IQ and education level. However, Defendant did not submit a copy of the psychiatric evaluation as an exhibit at the evidentiary hearing on the motion to suppress, attach the document as an exhibit to his motion, or request that the Court review the document for purposes of ruling on the motion to suppress.[4] Thus, while the full-length video recording of Defendant's interview with law enforcement, admitted into evidence as the Government's Exhibit 1, demonstrates that Defendant advised the officers that he had a fourth-grade education, Defendant did not present any evidence at the hearing supporting his assertion that he had a "low IQ."

In any event, even if the Court considers the psychiatric evaluation conducted by Jeremiah Dwyer, Ph.D in connection with Defendant's competency hearing [ECF No. 55], the report does not provide a sufficient basis for a determination that Defendant is or was so impaired that he could not acknowledge understanding his rights or waiving them at the time of the interview at issue. With respect to Defendant's cognitive deficits, Dr. Dwyer noted that Defendant's "overall cognitive functioning is below average" but that "his cognitive deficits are not so low as to render

---

[4] While the rules of evidence may not apply rigidly in suppression proceedings, this does not mean that there are no evidentiary standards whatsoever. See United States v. Henderson, 471 F.3d 935, 937-38 (8th Cir. 2006) (the rules of evidence do not apply with full force at suppression hearings).

him incompetent to proceed[.]" [ECF No. 55, page 18]  Dr. Dwyer found that Defendant's IQ was between 70-79, or in the "borderline" range of functioning and that it was expected that Defendant "experiences a number of moderate intellectual deficits," and "below average intellectual functioning, but not to the degree of intellectual disability[.]" [ECF No. 55, at page 1-2, 5, 12]  Dr. Dwyer noted Defendant estimated that he had a fourth-grade education. [ECF No. 55]

Here, as Officer Moritz read Defendant his *Miranda* rights, Defendant repeatedly nodded his head and said "mmm-hmmm," suggesting Defendant understood his rights. When Officer Moritz placed the waiver form in front of Defendant and advised Defendant that he needed to understand his rights before the officers could question him, Defendant stated "I already know what my rights is man, do I got to sign that?" When Officer Moritz asked Defendant if he understood his rights and was comfortable talking to Officer Moritz, Defendant again responded affirmatively by nodding his head and saying "mmm-hmm." Defendant, who has prior experience in the criminal justice system, did not further inquire about his *Miranda* rights and answered the officers' questions.

Defendant's statements during the interview demonstrate his capability of assessing situations and making tactical decisions.  For the first half of the interview, Defendant feigned ignorance not only of the robbery that led to his arrest but also any knowledge of his whereabouts around the time of his arrest due to illness and drug use. Defendant misled the officers about which hand he used to hold a firearm and told officers he sometimes sold the ammunition in an apparent attempt to distance himself from evidence related to the robberies.

Defendant subsequently admitted to choosing "easy" targets and engaging in an organized scheme to avoid capture after committing a robbery. Defendant told the officers that he changed clothes and used his cane after committing a robbery so that he no longer matched witness's

13

descriptions and people would ignore him. Defendant's statements and actions demonstrate a sufficient level of sophistication and support a finding that Defendant was capable of understanding his *Miranda* rights and of voluntarily waiving them. See United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (defendant's waiver was knowing and intelligent despite defendant's low IQ, PCP intoxication, and mental illness). See also United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011) (holding defendant's statement was voluntary despite "borderline I.Q." and holding lack of education and lower-than-average intelligence are factors in voluntariness analysis but do not dictate a finding of voluntariness particularly when the suspect is intelligent enough to understand his constitutional rights); United States v. Quinn, 130 F. App'x 832, 833 (8th Cir. 2005) (defendant's "mild mental retardation and minimal reading ability" did not render his waiver of *Miranda* rights involuntary); Makes Room, 49 F.3d at 415 (waiver and confession of defendant with lower than average intelligence and eighth grade education were voluntary when he was "clearly intelligent enough to understand his rights and to know how to invoke them").

    3. Coercive Police Tactics

Defendant further contends he "would not have been able to waive his rights in any meaningful sense" in light of his intelligence and education, when combined with law enforcement's coercive police tactics. Defendant contends the officers engaged in coercive policy tactics by: (1) "icing out" Defendant by making him waiting in the interview room alone before beginning the interview, (2) by attempting to "ingratiate themselves" to Defendant by "chit chatting" with Defendant early in the interview, and (3) conducting "extensive" questioning.[5]

---

[5] Defendant asserts the officers exerted "psychological pressure" on him through the use of the "Reid Technique." Defendant describes the "Reid Technique" as "physical isolation of the subject followed by a nine-step interrogation process." [ECF No. 76] Although Defendant asserts this interrogation technique was employed by the officers, he provides no description of the technique and no

14

As already noted, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'…." Connelly, 479 U.S. at 167 (1986). To characterize a statement as involuntary, the statement must be obtained "by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724. "[T]actics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993).

Here, Defendant was alone in the interview room for approximately 40 minutes prior to questioning, during which time he ate and drank some of the food provided to him. The officers began the interview by providing Defendant with a cigarette and asking Defendant about himself for approximately 20 minutes. The officers began questioning Defendant at 11:51 a.m. and the interview concluded at 2:30 p.m., meaning the officers questioned Defendant for less than three hours. After Defendant waived his *Miranda* rights, the officers questioned Defendant about the robberies for approximately 70 minutes before Defendant appeared to become upset. At that point, the officers gave Defendant another cigarette and took a 13-minute break from questioning. On resumption of the interview, Defendant immediately requested to see photographs from the robberies and, shortly thereafter, admitted to previously lying to the officers about certain details and admitted to committing multiple robberies. The second half of the interview during which

---

analysis supporting his conclusion that the technique was used in this case. Notably, Det. Hayden testified at the evidentiary hearing that he was aware of the technique but had not received training in this method. (Tr. 20). Defendant did not produce evidence at the hearing demonstrating that the officers utilized this interview technique. Even assuming this interrogation technique was employed, use of the Reid Technique is not *per se* impermissible. See United States v. Monroe, Cr. No. 16-055 WES, 264 F.Supp.3d 376, 393 (D. RI Sept. 11, 2017) (the Reid Technique "falls withing the range of acceptable interrogation tactics sanctioned by the First Circuit").

15

Defendant offered his confession lasted just over an hour.

A thorough review of the video introduced at the hearing demonstrates that the interrogation was completely devoid of physical threats or coercion and, contrary to Defendant's assertions, the officers used no improper coercive questioning tactics. While the officers expressed sympathy towards Defendant's circumstances, specifically his homelessness and alleged ailing physical health, the record does not support a finding that their use of sympathy overcame Defendant's will. Furthermore, neither the length of the interview nor the amount questioning could reasonably be classified as excessive or overbearing. See Jenner, 982 F.2d at 334 (finding questioning that lasted for six or seven hours is not per se unconstitutionally coercive). When Defendant appeared to become distressed, the officers paused the interview and allowed Defendant a break.  After the break, Defendant reinitiated the discussion about the robberies with the officers. Here, the totality of the circumstances demonstrate that law enforcement's actions were not sufficient to "overbear the defendant's will and critically impair his capacity of self-determination." See LeBrun, 363 F.3d at 724; Bustamonte, 412 U.S. at 224-25.

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [ECF No. 76] be **DENIED**.

**The parties are advised that they have fourteen (14) days after service of this Report and Recommendation in which to file written objections to it**, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to review.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990) (per curiam); 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59.

This matter is set for trial before the Honorable Audrey G. Fleissig, United States District Judge, on **February 5, 2024 at 9:00 a.m.**

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of November, 2023